AUSA: Cathleen M. Corken                Telephone: (313) 226-9100

Special Agent        : Andrew R. West        Telephone: (313) 226-0594

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Michigan

ORIGINAL
33

United States of America,

　　　　　Plaintiff,

v.

Iram Jafri

| |
|---|
| Case: 2:16-mj-30418 |
| Assigned To : Unassigned |
| Assign. Date : 9/12/2016 |
| Description: CMP USA v. SEALED MATTER (SO) |

　　　　　Defendant(s).

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of <u>February 2011 to present.</u>                , in the county of <u>Wayne and elsewhere</u>
in the <u>Eastern</u>                District of <u>Michigan</u>                , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. Section 1324(a)(2)(B)(ii) | Alien Smuggling for Purposes of Financial Gain |

This criminal complaint is based on these facts:
See attached AFFIDAVIT.

☑　　Continued on the attached sheet.

_____
*Complainant's signature*

<u>Andrew R. West, Special Agent, DSS-U.S. Dept. of State</u>
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 12, 2016

_____
*Judge's signature*

City and state: <u>Detroit, Michigan</u>

<u>Anthony P. Patti, U.S. Magistrate Judge</u>
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Andrew R. West, being duly sworn, hereby depose and state as follows:

1. I have been a Special Agent with the United States Department of State, Diplomatic Security Service since November, 1999. As an agent of the Diplomatic Security Service, I am a "special agent of the Department of State" within the meaning of Section 2709 of Title 22, United States Code, and am authorized under that statute to conduct investigations relating to "illegal visa issuance or use," including alien smuggling, and to make arrests for such offenses.

2. From April 2008, to the present, I have been assigned as a Task Force Officer to the Homeland Security Investigations Office of the Special Agent in Charge, Detroit, Michigan. I have been involved in dozens of investigations relating to smuggling non-U.S. citizens into U.S. and to the procurement of immigration benefits, such as visas, by fraud.

3. This affidavit is in support of a criminal complaint and arrest warrant charging Iram Jafri with violations of 8 U.S.C. § 1324(a)(2)(B)(ii): Alien Smuggling for Purposes of Financial Gain.

4. The information contained in this affidavit is based on my own personal knowledge and involvement in the investigation and reports and information from other law enforcement officers and other individuals involved in the investigation. Because this affidavit is being submitted for a limited purpose of establishing

probable cause, I have not set forth all of the information known to me concerning this investigation.

## **PROBABLE CAUSE**

5.   Section 1324(a)(2)(B)(ii) of Title 8 of the United States Code makes it a federal offense for anyone to bring or attempt to bring an alien to the United States, knowing or in reckless disregard of the fact that the alien has not received prior official authorization to come to, enter, or reside in the United States. If the act of bringing the alien or attempting to bring the alien to the United States is done for the purpose of commercial advantage or private financial gain, enhanced, mandatory penalties apply.

6.   As is more fully detailed hereinafter, the investigation has revealed that, from 2011 to the present, in exchange for payment and for profit, defendant Iram Jafri engaged in a scheme to fraudulently obtain numerous visas for illegal aliens living and working in the United States with the ultimate goal of obtaining permanent residency (a Form I-551, Permanent Resident Card, commonly referred to as a "green card") for the aliens.  Based on witness interviews, document review and document analyses, investigators have determined that, in the first stage of the scheme, defendant Jafri fraudulently obtained H-2A Temporary Agricultural Worker visas for illegal aliens living in the United States.  In order to complete this stage of the scheme, defendant Jafri transported multiple illegal aliens from

2

Windsor, Canada, to the U.S. port of entry in Detroit, Michigan, where she assisted the illegal aliens in entering the U.S. based on the visas she had fraudulently obtained.   After the illegal aliens re-entered the United States with the illegally obtained H-2A visas, defendant Jafri subsequently submitted additional paperwork requesting nonimmigrant NAFTA Professional visas (also known as TN visas) for some of the aliens she assisted to enter the United States.  In the third and last stage of the scheme, defendant Jafri claimed that A.J & Associates would obtain a green card for the alien, which would allow the alien to reside in the U.S. permanently.

### Jarfi's Fraudulently Obtained H-2A Visas And Brought Aliens Into the United States Based on Those Visas.

7.     The investigation has revealed that Iram Jafri is the Vice President and Regional Manager of A.J & Associates Immigration Firm Inc.[1] (hereinafter "A.J & Associates"), an immigration consulting firm headquartered in Windsor, Ontario, Canada.

8.     According to corporate and other records, the firm opened an A.J & Associates office in Texas in 2010 and a second office in Kansas in 2011.  At the time the Kansas office opened, A.J & Associates, largely through word of mouth,

---

[1]  "A.J & Associates," with no period after the "J," is the way the company's name appears on corporate documents, company business cards, and filings with U.S. government agencies.

advertised that the firm could fix the immigration situation of illegal aliens working in the U.S. and help them obtain legal presence in the U.S.

9. Based on witness interviews, document review, and document analyses, investigators have determined that in the first stage of the scheme, defendant Jafri fraudulently obtained H-2A Temporary Agricultural Worker visas for aliens living in the areas of Seminole, Texas, and Garden City, Kansas and elsewhere.

10. The H-2A program allows U.S. employers who meet specific regulatory requirements to bring foreign nationals to the U.S. to fill agricultural jobs which are seasonal in nature. It is the U.S. employer, or the employer's agent, who files an application or petition for a prospective alien worker to be granted the H-2A classification.

11. The H-2A petition (Form I-129), Petition for a Nonimmigrant Worker, is filed with United States Citizenship and Immigration Services (USCIS). Regulations require that when a U.S. employer uses an agent such as an immigration consultant to act for him vis-à-vis USCIS, the agent must complete a form G-28, called "Notice of Entry of Appearance of Attorney or Accredited Representative." The H-2A petition itself contains a section, Part 8, where the person preparing the form, if other than the U.S. employer, provides his or her name and address.

12.   Law enforcement agents have reviewed nearly one hundred H-2A applications where defendant Jafri was named on the G-28 form for the H-2A applications submitted to USCIS or where the application otherwise indicates A.J & Associates' involvement. Based on a review and analysis of these filings, as well as witness interviews, investigators have determined that defendant Jafri filed numerous H-2A applications on behalf of U.S. employers in Texas and Kansas which falsely represented that, if the H-2A petitions were approved, the alien would enter the United States from Canada or Mexico for the purpose of beginning new employment with the U.S. employer as a temporary, seasonal agricultural worker. In fact, as witness interviews and additional evidence, as described below, show, Jafri knew the alien was already present in the United States working for the U.S. employer on a permanent basis.

13.   The H-2A petitions where defendant Jafri is named as the preparer indicated that the Detroit port of entry should be notified if the application was approved. Based on multiple interviews of aliens and their U.S. employers, investigators know that, once an H-2A petition was approved, defendant Jafri instructed the aliens to travel with their spouse and non-U.S. children to Detroit, leaving their vehicle in the Detroit area, before crossing the border to Canada and to the A.J & Associates office in Windsor, Ontario.

14.   When the alien and his family members arrived at the A.J & Associates office in Windsor, Ontario, defendant Jafri instructed the aliens to remove any documents, credit cards, and currency linking the aliens to the United States so that their residence in the United States would not be detected by U.S. border agents. Defendant Jafri also instructed the aliens not to reveal to U.S. border agents that they lived and worked in the United States.

15.   Defendant Jafri demanded a cash payment for her to take the alien and his family to the U.S. border and to talk to U.S. officials on their behalf.

16.   Witnesses have recounted to investigators that defendant Jafri would then drive the alien and the alien's family to the U.S.-Canadian border and escort the alien through the entry process.  At the U.S. border, the alien received a nonimmigrant alien registration form called an I-94 which allowed the alien to enter the U.S.  The aliens in this case obtained their I-94s and were allowed to enter the United States based on the H-2A classification fraudulently obtained by defendant Jafri.

17.   Witnesses and bank records also indicate that defendant Jafri received payment from U.S. employers and illegal aliens in return for fraudulently obtaining nonimmigrant alien registration forms, called I-94s, based on the H-2A classification.  Defendant Jafri also received payment for transporting the alien across the U.S.-Canadian border and talking to U.S. officials on the alien's behalf in

6

order to ensure that the alien obtained the I-94 based on defendant Jafri's fraudulently submissions.

## Defendant's Attempted Smuggling Of P.B. And H.B. Into The U.S.
## And The Discovery of the Scheme

18. CBP records indicate that, on May 9, 2012, two illegal aliens, hereafter referred to as P.B. and H.B., a married couple who are Canadian citizens, attempted to enter the U.S. via the Detroit-Windsor Tunnel based on an H-2A visa classification. A review of the H-2A visa petition relating to the couple revealed that it was prepared and submitted by an Iram Jafri on behalf of a U.S. employer, hereafter referred to as C.B., of Sublette, Kansas. The H-2A petition indicated that Detroit was the planned port of entry for the visa recipients. USCIS records pertaining to the H-2A petition indicated that immigration authorities faxed a notice to U.S. Customs and Border Protection (CBP) at the Detroit-Windsor tunnel indicating that the H-2A petition had been approved.

19. CBP records indicate that Iram Jafri accompanied the couple to the port of entry and told CBP she was assisting the couple in their entry process. Under questioning by CBP, the couple admitted they had been living in the U.S. illegally for seventeen years. Both stated they had told defendant Jafri they were living in the country illegally. The couple also admitted that the proposed work location in Kansas was, in fact, their own residence and that the purported owner of the

7

harvesting company and their prospective employer, as reflected on the H-2A petition, was their teenage daughter. As a result of their admissions, both P.B. and H.B. were denied entry into the U.S.

20.    In a subsequent interview with investigators, the couple stated that they had heard from others in their community that A.J & Associates could help illegal aliens obtain legal status. The couple went to the A.J & Associates' Garden City, Kansas, office and there a secretary set up a Skype session that allowed them to communicate directly with defendant Jafri in her office in Canada. Defendant Jafri indicated that the long-term plan was to obtain permanent residency for the couple.

21.    P.B. and H.B. told investigators that defendant Jafri completed the paperwork for their visa applications. As partial payment for Jafri's work, H.B. signed a check from the family's personal bank account to A.J & Associates. Investigators obtained the relevant check which shows that it was dated November 14, 2011, and was in the amount of $3,750.00. Printed on the face of the check is the full name of P.B. and H.B and the home address of the couple, 1808 XXXX Drive in Sublette, Kansas. Bank records from an A.J & Associates account at JP Morgan Chase indicated that this check was deposited into the business account at the bank's branch located in Detroit, Michigan, on December 8, 2011, under a deposit slipped signed by an Iram Jafri. While the face of P.B. and H.B.'s check clearly indicated their home address in Kansas, the documentation submitted by

Jafri to USCIS for their H-2A petition indicated that they permanently resided in Canada.

22.     During the processing of the H-2A visa for P.B., USCIS mailed defendant Jafri a request to confirm the address of the company for whom P.B. was purportedly coming into the country to work.  (USCIS had run the address provided on the H-2A application through a database and was unable to locate the company's business records, and thereby confirm its existence.)  The defendant, using the e-mail account iram@immigrationinquiry.com, subsequently sent P.B. the following e-mail:

> Do you have any mail that has your address of [the company's name] to P.O. Box 254?  Like bank statement? Or your tax returns.
> Please send it to me today.

23.     This e-mail, seeking P.B.'s U.S. tax returns and bank statements, and referencing his address in the U.S., all confirm defendant Jafri's knowledge of the falsity of her representations in the H-2A application regarding P.B.'s residence outside the United States.

24.     During an interview with law enforcement, P.B. and H.B. stated that they paid A.J & Associates $10,000 for preparing the forms. Once the H-2A applications were approved, the couple stated that defendant Jafri instructed them to drive to Detroit, leave their car on the U.S. side of the border, and make their way to the A.J & Associates office in Windsor.  The couple did so and once they arrived at the office,

defendant Jafri coached them on what to say at the border, including that they should never admit that they were living in the U.S. They were also required to pay the defendant an additional $1,000 in cash for her to represent them at the border.

25. The couple told law enforcement that the defendant initially told them the process was entirely legal. They realized the fraudulent nature of the process when paperwork was sent to their home indicating that their teenage daughter was their employer and owner of their business.

26. During the course of the investigation, I have reviewed bank records that show P.B. and H.B. paid A.J & Associates $12,275 via checks and wire transfers. Together with the $1,000 cash payment the couple made to defendant Jafri on the date of the attempted crossing, May 9, 2012, defendant Jafri received a total of $13,275 for attempting to bring the P.B. and H.B. into the U.S. based on fraudulently obtained visas. All of the payments, other than the cash payment, were all deposited into the JPMorgan Chase Account *******97 held in the name of A.J & Associates. The dates, means and amounts of those payments are detailed in the table below:

| Check Number | Signed By | Date | Amount | Date of Deposit into Target Account **97 |
|---|---|---|---|---|
| 5936 | H.B. | 11/14/2011 | $3,750.00 | 12/8/2011 |
| Wire | H.B. | 12/16/2011 | $3,800.00 | |
| Wire | H.B. | 1/23/2012 | $975.00 | |
| Wire | P.B. | 5/7/2012 | $3,750.00 | |

**Defendant's Smuggling Of B.W. And M.B. Into The U.S.**

27.     Following the incident at the border with P.B. and H.B., law enforcement conducted a number of interviews of U.S. employers and illegal aliens in their employ on whose behalf A.J & Associates submitted visa applications.  Among those interviewed were E.K., a farmer owner in Sublette, Kansas, and his employee, B.W., who was an illegal alien.

28.     B.W. told law enforcement that he arrived in the U.S. from Mexico with his family in 1995 at the age of seven.  After completing his formal schooling to the eighth-grade level, B.W. began working on various farms and in 2011 was hired by E.K. to work on E.K.'s family farm.

29.     Before agreeing to hire him, E.K. told B.W. he needed to get legal immigration status.  B.W. stated he had friends who obtained H-2A visas through A.J & Associates and subsequently called the A.J & Associates office to discuss his situation.  After being told his chances of getting H-2A status were "90 percent," B.W. approached E.K. and asked him to sponsor an H-2A visa petition.

30.     Both E.K. and B.W. told law enforcement they went to the A.J & Associates office in Garden City, Kansas, where they talked with defendant Jafri in Canada via Skype.  As a result of these conversations, defendant Jafri prepared an application for an H-2A visa on behalf of B.W. which was submitted to USCIS.  A review of

that application shows that it was prepared by an Iram Jafri and falsely represents that B.W. had been living and working in Canada, would enter the United States for the first time from Canada and would begin new employment with the U.S. employer as a temporary, seasonal agricultural worker.

31.     The H-2A application submitted for B.W. by Jafri indicated that the Detroit port of entry should be notified if the petition were approved.  USCIS records indicated that, on January 13, 2012, USCIS approved the H-2A classification for B.W. and sent a notice of approval of the H-2A status to the defendant and to E.K. On January 17, 2012, USCIS also faxed the approval notice to the Detroit-Windsor Tunnel port of entry.

32.     During an interview with law enforcement, B.W. stated that defendant Jafri told him that, once the H-2A was approved, he needed to go to Canada and meet her at the A.J & Associates office in Windsor.  Accordingly, B.W. and his wife M.B. traveled to Detroit and left their car at a long-term parking lot at Detroit Metro Airport.  After being picked up by relatives and taken to Canada, B.W. and M.B. spent a weekend in Ontario and then met defendant Jafri at the A.J & Associates office on Monday, January 30, 2012.  While at the office B.W. paid defendant Jafri $2,500 in cash as a border crossing fee.  B.W. told investigators that defendant Jafri had B.W. and M.B. empty their luggage of any items that indicated they lived in the

U.S. Among these items were medical records from Kansas relating to M.B.'s recent pregnancy, which defendant Jafri threw into the trash.

33. Records maintained by CBP indicate that later that morning, on January 30, 2012, B.W. and M.B. applied for entry into the U.S. from Canada accompanied by defendant Jafri at the Detroit-Windsor Tunnel. The records indicate that B.W. and M.B. were passengers in a vehicle operated by Jafri. B.W. told law enforcement that during the inspection process at the border, B.W. was asked to produce proof of his marriage between himself and his wife in order for her to obtain an H-4 visa to enter the United States. (H-4 visas are issued to individuals who are able to prove a familial connection with an H-2A visa holder.) While waiting in line to speak to the CBP inspector, B.W. told defendant Jafri that the only proof he had was his Kansas marriage certificate. The defendant told B.W. not to show the certificate to the officer, presumably because it would have revealed B.W. and M.B.'s presence in the U.S. Instead, B.W. said, as instructed by defendant Jafri, he showed the officer his Mexican birth certificate, written in Spanish. The officer told B.W. and defendant Jafri that they needed to return to Canada and get the certificate properly translated in order for M.B. to enter the U.S. The CBP officer then approved admission to the U.S. for B.W., but not for his wife, M.B., and issued I-94 form number ********020 to B.W. based on the fraudulently obtained H-2A classification.

34.     B.W. stated he and M.B. then returned to defendant Jafri's car and assumed they were returning to Canada.  Once in the car, the defendant told M.B. to lie down on the back seat, and the defendant then drove out of the CBP inspection area and into Detroit and then to the couple's car at the airport.

35.     During the course of the investigation, I have reviewed banking records that show B.W. and his employer, E.K., paid A.J & Associates $2,700 by check. Together with the $2,500 cash payment B.W. made to defendant Jafri on the date of the crossing into the U.S. on January 30, 2012, defendant Jafri received a total of $5,200 for bringing B.W. into the U.S. based on a fraudulently obtained visa and for clandestinely transporting M.B. across the border.  The check payments were all deposited into the A.J. & Associates JPMorgan Chase Account, account number *****97.  The dates, means and amounts of the check payments from B.W. and E.K. are detailed in the table below:

| Check Number | Signed By | Date | Amount | Date of Deposit into Target Account **97 |
|---|---|---|---|---|
| 5832 | E.K. | 8/24/2011 | $1,250.00 | 9/22/2011 |
| Money Order | B.W. | 10/9/2011 | $100.00 | |
| Money Order | M.B. | 10/9/2011 | $100.00 | |
| 6014 | E.K. | 1/3/2012 | $1,250.00 | 1/6/2012 |

**Defendant's Smuggling Of C.T., B.L. and P.P. Into The U.S.**

36.    Based on interviews, review of filings and document analyses, investigators have determined that defendant Jafi also fraudulently obtained H-2A visas for employees of K.C., a farm owner in Satanta, Kansas, and the employer of illegal aliens C.T., B.L. and P.P.  During an interview with law enforcement, P.P. stated that he first heard about A.J & Associates from a friend of his who received an H-2A visa.  P.P. and C.T. agreed to approach their employer K.C. to determine if he would be willing to sponsor H-2A visas for them and B.L.

37.    B.L. told law enforcement that he, CT. and P.P. went to the A.J & Associates office with their employer, K.C. While at the office the four men participated in a Skype session with "Ken" who told the men that, as long as the employees did not have a criminal record, there would be no problem in obtaining visas.  Aboutaam explained that in order to receive H-2A visas, the three employees would need to travel to Canada to get their visas and then reenter the United States.  The men subsequently decided to use A.J & Associates to file for H-2A visas.

38.    USCIS records reflect that H-2A applications were submitted by an Iram Jafri of A.J & Associates on behalf of C.T., B.L. and P.P.  Those applications and supporting documents fraudulently stated that all three employees had been living and working in Ontario, Canada, would enter the United States from Canada in order to begin new employment with K.C. as temporary, seasonal, agricultural workers.

15

39.     The H-2A applications filed for C.T., B.L. and P.P. indicated that the Detroit port of entry should be notified if the petitions were approved. USCIS records reflect that, on January 27, 2012, USCIS approved the H-2A classification for all three men based on the H-2A petitions filed by Jafri. USCIS sent a notice of approval of the H-2A status to defendant Jafri and to K.C. On January 30, 2012, USCIS also faxed approval notices of the H-2A petitions relating to C.T. and B.L. to the Detroit-Windsor Tunnel port of entry. On January 31, 2012, USCIS faxed the approval notice for P.P. to the Detroit-Windsor Tunnel port of entry.

40.     According to witness interviews, after receiving approval for the H-2A visas, the three employees and employer K.C. drove to Denver, Colorado, where they took a flight to Detroit Metro Airport. Upon arriving at the airport K.C. went to a hotel while the three employees were picked up by an uncle of P.P.'s and taken to Windsor, Ontario, Canada.

41.     P.P. told law enforcement that when he, C.T. and B.L. arrived at the A.J & Associates office in Windsor, defendant Jafri instructed the men to remove from their wallets anything that would tie them to the United States.

42.     Records maintained by CBP indicate that, on February 10, 2012, C.T., B.L. and P.P. applied for entry into the U.S. from Canada accompanied by Jafri at the Detroit Windsor Tunnel. The records indicate the three men were passengers in a vehicle operated by Jafri. Based on the approved H-2A visa, C.T. was issued I-94

16

number ********720, B.L. was issued I-94 number ********020 and P.P. was issued I-94 number ********920.

43.     According to statements made by C.T., B.L. and P.P. during interviews with law enforcement, after entering the U.S., defendant Jafri drove the men to the Detroit Metropolitan Airport where K.C. paid Jafri $1,000 via check as the border crossing fee.  K.C. then took a return flight to Denver with his employees and drove back to Kansas.

44.     During the course of the investigation, I have reviewed banking records showing that K.C. and C.T. paid A.J & Associates $12,625 via checks that were deposited into A.J & Associates' JPMorgan Chase account, number *******97. Together with the $1,000 cash payment K.C. made to defendant Jafri on the date of the crossing into the U.S. on February 10, 2012, defendant Jafri received a total of $13,625 for bringing P.P., C.T. and B.L into the U.S. based on a fraudulently obtained visas.  The dates, means and amounts of the check payments from K.C. and C.T. to A.J & Associates are detailed in the table below:

| Check Number | Signed By | Date | Amount | Date of Deposit into Target Account **97 |
|---|---|---|---|---|
| 1038 | K.C. | 10/18/2011 | $25.00 | 11/4/2011 |
| 1048 | K.C. | 10/31/2011 | $3,750.00 | 11/18/2011 |
| 1164 | C.T. | 11/3/2011 | $2,500.00 | 11/18/2011 |
| 1451 | P.P. | 11/3/2011 | $2,500.00 | 11/18/2011 |
| Money | B.L. | 11/9/2011 | $100.00 | 12/8/2011 |

| Order | | | | |
|---|---|---|---|---|
| 1138 | K.C. | 1/9/2012 | $3,750.00 | 1/17/2012 |
| 1160 | K.C. | 2/10/2012 | $1,000.00 | 2/10/2012 |

## DEFENDANT'S SUBMISSION OF FRAUDULENT DOCUMENTS

45. Law enforcement agents have conducted an extensive review of visa applications and related documents submitted by A.J & Associates. As is more fully described below, that review has revealed that numerous documents, on their face, have clear indicia of fraud and that the fraud appeared to be of a pervasive nature among the visa applications submitted by A.J & Associates.

### Submission of Fraudulent Recruitment-Related Letters To DOL

46. Before applying with immigration authorities for an H-2A visa, U.S. regulations require that an applicant first obtain a "temporary labor certification" from the U.S. Department of Labor (DOL), which is preceded by a separate application to the State Workforce Agency in the state in which the U.S. employer is located. In this case, investigating agents have obtained and reviewed well over one hundred DOL and State Workforce Agency applications where the applications indicate that defendant Jafri was acting as the agent for the U.S. employer and was preparing the DOL forms.

47. In order for DOL to provide a temporary labor certification, the U.S. employer, or his agent, is required by regulation to place advertisements in

newspapers seeking U.S.-based workers to fill the job. In addition, regulations require that the U.S. employer contact former U.S. employees who were employed in the job the previous year and solicit their return to the job. The U.S. employer, or his agent, is required to submit a "recruitment report" to DOL setting forth the results of these recruitment efforts.

48. In conjunction with DOL applications where defendant Jafri is indicated as the agent submitting the application, a letter was included indicating that advertisements had been placed for the job the U.S. employer was seeking to fill and identifying the newspapers in which advertisements for the jobs were purportedly placed. Although these recruitment-related letters bear a signature in the name of the U.S. employer, the evidence demonstrates these letters were created and submitted by A.J & Associates. The evidence further demonstrates that these letters were fraudulent.

49. Law enforcement agents have interviewed U.S. employers who have stated they did not place the advertisements and confirmed that the recruitment-related letters submitted to DOL did not bear their true signatures. In addition, many of the recruitment-related letters employ the identical language, indicating that a single source created them. For example, recruitment-related letters submitted with fifteen different DOL applications use this identical language: "I have not contacted any former employees because they were fired and dismissed due to abandonment of

worksite and were charged of another employee [sic] and stolen goods." Those fifteen letters were related to DOL applications where defendant Jafri is indicated as the agent submitting the application on behalf of fifteen different U.S. employers located in two different states, Kansas and Texas. In addition, the recruitment-related letters submitted to DOL have the same format and use the same font. Lastly, the state of Oklahoma is misspelled as "Oaklahoma" in the letters. All of these facts support the conclusion, and corroborate witness statements, that it was A.J & Associates that created these recruitment-related letters.

50. The evidence establishes that the recruitment-related letters submitted with the DOL applications are fraudulent. The letters indicate the names of the newspapers in which advertisements for the job were purportedly placed. The newspaper entities identified in twenty-five of the letters confirm that there are no records of any advertisements having been placed in their newspapers.

51. Many of the DOL applications where defendant Jafri is indicated as the agent submitting the application included receipts or invoices from the newspaper entities purportedly evidencing payment to them for placement of advertisements. The newspaper entities have confirmed that no records existed of these payments.

52. There are additional indications of the fraudulent nature of these invoices. For instance, there were several DOL applications where a receipt from the Hugo Daily News was submitted. All of these receipts—for different advertisements, for

different jobs in different cities and for different employers—are for precisely the same amount of $95.00.

53. There are also several receipts that purport to evidence payment to the Hobbs Daily News where the letter indicates that advertisements were placed in that newspaper. The invoices submitted, however, are not from the Hobbs Daily News. All of the invoices bear the name of a completely different newspaper, the Valencia County News-Bulletin, which law enforcement has determined has no connection to the Hobbs Daily News. Those invoices also all reflect precisely the same amount of $138.18.

### Cover Letters with H-2A Applications Containing False Statements

54. Once the DOL labor certificate is obtained, the U.S. employer, or his agent, submits the labor certification along with an H-2A application (Form I-129) to USCIS. As stated, when an employer uses an agent, such as an immigration consulting firm, to act for the employer vis-à-vis USCIS with respect to an H-2A petition, a form is completed by the agent indicating that the agent is acting for the U.S. employer.

55. Based on witness interviews and document review, investigators determined that those H-2A applications where defendant Jafri is indicated as the preparer included several false statements. For instance, the applications omitted the material fact that the illegal alien was already present in the U.S. and working for the U.S.

employer. The applications also falsely represented that the petition was submitted for purposes of the illegal alien's "new employment" with the U.S. employer.

56. Each of the H-2A applications was mailed with a cover letter that purported to be from the U.S. employer and signed by him. The evidence demonstrates the letters were not written or signed by the U.S. employer. The cover letters submitted for the H-2A applications where defendant Jafri is indicated as the preparer have the same distinctive font and format, the same section headings, the same sentences in bold, and the same words capitalized. Many of the cover letters from different employers for different employees use the exact same language. For example, when describing the qualifications of the alien, many of the letters state that the alien's experience was "much more than we had requested."

57. The investigation has revealed that there are numerous false statements in the cover letters. Each of the letters state the illegal alien permanently resided in Canada or Mexico, that the illegal alien had been employed in Canada or Mexico for a number of years, and that the illegal alien would maintain his permanent residence in Canada or Mexico while temporarily in the U.S. to work for the duration of his H-2A employment, if approved.

58. The investigating agents have interviewed several of the illegal aliens, all of whom admitted they had been living in the U.S. unlawfully for many years, working for the U.S. employer during that time. In addition, state license records indicate the

aliens had a driver's license in the years before the filing.  Further, credit history reports indicate that bank accounts and credit card accounts were opened and maintained before the H-2A application.   Records obtained from Canadian authorities indicate that the illegal aliens crossed from the U.S. into Canada shortly before re-crossing back into the U.S. on the approved H-2A visa.

## FRAUDULENT TN VISA APPLICATIONS

59.    The nonimmigrant NAFTA Professional visa (or "TN visa") permits citizens of Canada and Mexico to work in prearranged business activities for employers in the United States at a professional level.  In order to obtain a TN visa application, the U.S. employer, or his agent, must submit evidence that the proposed employee has experience sufficient to demonstrate that he is a professional in the relevant field.

60.    Subsequent to their re-entry into the United States, TN visa applications were submitted by A.J & Associates for illegal alien employees B.W., C.T. and B.L, as well as multiple other illegal aliens for whom A.J & Associates had initially obtained H-2A visas.[2]  In connection with these TN visa applications, as is explained in detail

---

[2] During a law enforcement interview, P.P. stated that the only reason a TN visa application was not filed for him was because he was too young and defendant Jafri determined that the government would not believe that he could have obtained the skills of a scientific technician or technologist while still a teenager.

below, investigators have determined that numerous false documents were submitted.

**Cover Letters Submitted with the TN Application and
Letters Submitted In Response to USCIS' Request For Evidence**

61.     There is evidence that the cover letters submitted with the TN applications, though bearing the signature of the U.S. employer, were, in fact, created by A.J & Associates. The Federal Express international mailers containing the TN applications and cover letters which USCIS received indicated that they were mailed from the Windsor address of A.J & Associates, as were the responses to USCIS's requests for additional evidence.

62.     A review of the TN cover letters and supporting documents submitted to USCIS for the TN applications reveals that they also share the same common, distinctive features indicating one source of those documents. For example, the cover letters use the same, distinctive font, formatting, section headings, and language, including idiosyncratic language (the employee "will be responsible to express his specialized scientific knowledge . . .") and typographical mistakes ("week killer," rather than "weed killer"). U.S. employers E.K. and K.C. both stated during interviews that it was defendant Jafri who completed and submitted the TN applications.

63.    The investigation has revealed that there are numerous misrepresentations in the TN applications, the accompanying cover letters, and other documents submitted with the TN applications.  For example, the cover letter submitted with the TN application for B.W., dated February 13, 2013, stated that B.W. "possesses six years of professional experience in Agricultural scientific technician [sic]" and that he gained his experience between 2006 and 2012 in Mexico working for a farmer named Benjamin L.  However, the cover letter submitted with B.W.'s H-2A visa application in 2012 stated that B.W. resided permanently in Canada and that he had gained his experience as an Agriculture Equipment Operator "from inside CANADA [sic]."  During an interview with law enforcement, B.W. stated that he had never worked in Mexico and had not lived there since he was a child.  B.W. further stated that he had never lived in Canada.

### Fraudulent Documents Relating To The Qualifications Of The Alien As An Agricultural Scientific Technician

64.    In support of the TN applications, the investigation has determined that fraudulent documents were also submitted for the purpose of establishing that the alien had the requisite knowledge and expertise to qualify as an agricultural scientific technician.  To that end, included with the TN applications was a fraudulent letter purporting to be from the employer of the illegal alien in either Canada or Mexico. The letters, sometimes entitled "Experience Letter," falsely stated that the alien

worked as an agricultural scientist for a significant period of time for the employer in Canada or Mexico and that the alien had participated in a training program for a scientific technician with that foreign employer.

65.     Those statements are disproven by the evidence that the alien lived and worked in the United States during the same time period the letters claim the alien was living and working in either Canada or Mexico. In addition, these foreign employer letters, though purportedly from different employers located in Mexico and Canada, all have common, idiosyncratic language, for example, "he was under the excessive [sic] training program with me." These commonalities indicate both the fraudulent nature of the letters, and the fact that one source, rather than multiple employers, created the letters.

66.     For example, the experience letters submitted for the TN application for B.W. and B.L. are purportedly from the same employer in Mexico. Both letters are signed by the same person, Benjamin L., and bear the same letterhead and address of a farm in Mexico. The letters state that B.W. worked as an agricultural science technician from 2007 until 2012. The letter for B.L., states that B.L. worked as an agricultural agronomist from 2000 until 2011. Furthermore, the letter submitted for C.T.'s TN visa application is identical word for word to the letter submitted for B.L., except for the fact that C.T.'s letter is signed by Henry T., and bears a different letterhead and farm address than the letter for B.L.

67. In addition, in describing the work experience and training of the aliens, these experience letters use the exact language, whole paragraphs on occasion, suggested in various resume-building websites, such as careerbuilder.com. In describing the substance of the two-year training program, most of the letters use the same language that appears in a chart on page eleven of "The Ontario Curriculum, Grades 9 and 10: Science," a document which sets forth the science curriculum for all secondary schools in the province of Ontario, Canada and which is available online.

68. The TN applications also included certificates that falsely attested that the alien had completed the two-year training program of the foreign employer, as well as fraudulent transcripts of the training program. In support of the TN applications, "Credential Evaluation Reports" were also submitted. These reports, purportedly from a company called "Evaluation World LLC," claimed that, based on the alien's work and participation in the training program of his employer in Canada or Mexico, the alien had the equivalency of training under a professional in the field of agricultural science in the United States. These evaluations contained the same false statements about the work and training experience of the alien in Mexico or Canada as are contained in the foreign employer letter.

## Fraudulent Documents To Establish The Qualifications
## Of An Alien's Supervisor

69.     In order to obtain a TN visa for a scientific technician, it must be established that the alien will work in direct support of someone who himself qualifies as a professional in the field of agricultural science.  The investigation has revealed that several types of fraudulent documents were submitted by A.J & Associates to meet this requirement.  Among these documents were "Credential Evaluation Reports" purportedly prepared by Evaluation World LLC to establish that the U.S. employer or someone under his employ had work experience that was the equivalent of a bachelor's degree in agricultural science.  Letters were also submitted confirming the experience and employment of an individual as an agricultural science supervisor.

70.     Interviews of U.S. employers and others establish that these documents are fraudulent, as do the accounts described below of accountant S.R. and employer E.K.  In addition, in many instances the letters relating to the experience of the supervisor, though they purport to come from different individuals associated with different farms in different cities, employ the exact same language – whole paragraphs – to describe the duties of the agricultural science supervisor, including idiosyncratic sentences such as, "He performs all experiments and does proper research and come [sic] up with valuable development of plants, animals or any

living thing." Large portions of the letters use the same language, verbatim, as suggested in various websites, for example, from the description of "Agricultural Scientist Responsibilities" on bestsampleresume.com. On their face, many letters can be seen to have been cut and pasted; in some instances, a letter references the name of one "supervisor" while the rest of the letter relates to another named "supervisor." All of these factors indicate both the single source of these letters and the fraudulent nature of their content.

71.     As previously recounted, defendant Jafri fraudulently obtained an H-2A visa for E.K.'s employee, B.W. E.K. confirmed to law enforcement in an interview that, subsequently, in early 2013, A.J & Associates was preparing a TN visa application for B.W. Defendant Jafri asked E.K. to write a letter stating his qualifications and describing his farming operation. E.K. told law enforcement that he wrote the letter as requested and provided it to defendant Jafri and provided a copy of the letter to law enforcement. In the letter, E.K. described his farm equipment and his work refurbishing diesel truck engines so they could be used for the irrigation system on his farm.

72.     E.K. explained during his interview that after he provided his letter to defendant Jafri, he learned that his accountant, S.R., received an e-mail from defendant Jafri. S.R. provided law enforcement with a copy of the e-mail he received from defendant Jafri. In the e-mail, sent on April 9, 2013, defendant Jafri asked S.R.

29

to review and sign a letter that was attached and to return it to her.  The letter that was attached to the e-mail contains none of the content E.K. wrote in his letter. Rather, the letter sent by defendant Jafri to S.R. contains a lengthy list of duties purportedly performed by E.K. on his farm, including extensive work with animals, and a statement that E.K. had worked mainly in agriculture science since the year 2000.

73.    The accountant, S.R., told law enforcement that he did not sign the letter and did not respond to Jafri's e-mail.  However, a copy of the letter bearing a signature not matching that of S.R. was submitted to USCIS via fax on April 29, 2013, in support of the TN application filed for E.K's employee B.W.  That same letter was also mailed to USCIS from defendant Jafri's office in Canada via FedEx on April 30, 2013.

## CONCLUSION

74.    Based on the information contained herein there is probable cause to believe Iram Jafri engaged in a criminal scheme involving the bringing of aliens into the U.S. knowing or in reckless disregard of the fact that the aliens B.W., M.B., C.T., P.P., and B.L. had not received prior official authorization to come to, enter, or reside in the United States for purposes of financial gain in violation of 8 U.S.C. § 1324 (a)(2)(B)(ii).

75. I further believe there is probable cause to believe that Iram Jafri did, in exchange for money for her personal gain, transport and assist the following aliens to enter the U.S. knowing that the aliens only entered the U.S. based on false information and fraudulent documents defendant Jafri submitted to the U.S. government:

| Date of Crossing | Aliens | Amount Paid |
|---|---|---|
| 01/30/2012 | B.W. & M.B. | $5,200 |
| 02/10/2012 | C.T., B.L. & P.P. | $13,625 |

All in violation of 8 U.S.C. § 1324 (a)(2)(B)(ii), Alien Smuggling for Financial Gain.

76.    Based on the information contained in this affidavit, I respectfully request that

a warrant be issued to arrest Iram Jafri.

Respectfully submitted,

Andrew R. West
Special Agent
Diplomatic Security Service
U.S. Department of State

Subscribed and sworn to before me on September 12, 2016

ANTHONY P. PATTI
UNITED STATES MAGISTRATE JUDGE